**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**AT NASHVILLE**

| | | |
|---|---|---|
| ROBERT CARMEN, | § § | |
| *Plaintiff,* | § § | Case No. _____ |
| v. | § § | JURY DEMANDED |
| | § | |
| CORECIVIC OF TENNESSEE, LLC, | § | |
| as owner and operator of TROUSDALE | § | |
| TURNER CORRECTIONAL CENTER, | § | |
| EMMANUEL AKINYELE, and | § | |
| LORRIE HENSON. | § § | |
| *Defendants.* | § | |

## COMPLAINT

For his Complaint, the Plaintiff states to the Court and the Jury as follows:

## I. INTRODUCTION

1.      In the early morning hours between Christmas of 2019 and December 26, 2019, Plaintiff Robert Carmen was brutally assaulted by three inmates at Trousdale Turner Correctional Center—a private prison operated by CoreCivic of Tennessee, LLC ("CoreCivic").  The assault left Mr. Carmen's jaw broken in three places.

2.      Like tens of thousands of previous assaults that had occurred at CoreCivic's Tennessee facilities, Mr. Carmen's assault was foreseeable and preventable.  So was the infection that developed in the weeks that followed, which steadily spread throughout Mr. Carmen's body, forced him to undergo almost a dozen excruciatingly painful surgeries, nearly killed him, and left him with a permanent partial disability because CoreCivic failed to provide the Plaintiff with constitutionally adequate medical care either at the time his

injury occurred or afterward.

3. Unfortunately for Mr. Carmen, while CoreCivic tolerates inmate assaults as a matter of routine, the cost of preventing foreseeable assaults and providing inmates constitutionally adequate medical care exceeds the cost of liability that CoreCivic faces due to its chronic recklessness and deliberate indifference to inmate health and safety. Consequently, incurring such expenses would cut into CoreCivic's profit margin—something that CoreCivic will not tolerate and is thus unwilling to do.

4. CoreCivic—which recently changed its name from Corrections Corporation of America after that name became synonymous with the most egregious aspects of America's private prison industry—is the nation's most notorious private prison operator. To maintain its profit margin—and as a result of CoreCivic's profit-driven deliberate indifference to inmate health and safety—CoreCivic serially and chronically underinvests in prison staff, security, and inmate healthcare at its prisons, leading to predictable results.

5. Among the results that CoreCivic has achieved through its deliberate indifference to inmate health and safety: Tennessee inmates who are housed at CoreCivic facilities are approximately twice as likely to die and more than four times as likely to be murdered—even though CoreCivic houses inmates with disproportionately low security designations. *See, e.g.,* Cassandra Stephenson, *Inmate death ruled homicide in a Tennessee CoreCivic prison where rate is twice as high as TDOC's, records show*, JACKSON SUN (Jan. 28, 2020), https://www.jacksonsun.com/story/news/crime/2020/01/28/corecivics-tennessee-prisons-have-twice-homicide-rate-tdocs/2776928001/ (**Exhibit #1**) ("The corporation's four Tennessee facilities hold roughly 35% of the state's prison population but accounted

for about 63% of the state's prison homicides."); Prison Legal News, *CoreCivic Prisons in Tennessee Have Twice as Many Murders, Four Times the Homicide Rate as State-Run Facilities*, PLN (Aug. 6, 2019), https://www.prisonlegalnews.org/news/2019/aug/6/corecivic-prisons-tennessee-have-twice-many-murders-four-times-homicide-rate-state-run-facilities/ (**Exhibit #2**) ("from 2014 through June 2019, there were twice as many murders in the four Tennessee prisons operated by CoreCivic (formerly Corrections Corporation of America) than in the 10 prisons run by the Tennessee Department of Correction (TDOC). Also, the homicide rate in CoreCivic facilities was over four times higher than the rate for TDOC prisons.").

6.     As a result of CoreCivic's strategic underinvestment in inmate health and safety—and even though CoreCivic houses less than one-third of Tennessee's inmates—CoreCivic is also responsible for nearly half of COVID-19 infections across Tennessee's prisons, *see* **Exhibit #3** (TDOC Inmates COVID-19 Testing), including some of the largest COVID-19 outbreaks in the entire nation.

7.     After allowing a disproportionately vast numbers of the inmates that it houses to become infected, and as a result of its strategic underinvestment in medical treatment, CoreCivic is also responsible for a dramatically outsized proportion of COVID-19 *deaths* in Tennessee's prisons—even though CoreCivic houses inmates who have a significantly lower risk of experiencing health complications. *See* Mike Osborne, *Roughly half of all Tenn. inmate COVID-19 deaths have occurred in CoreCivic prisons*, WMOT (Oct. 2, 2020), https://www.wmot.org/post/roughly-half-all-tenn-inmate-covid-19-deaths-have-occurred-corecivic-prisons#stream/0 (**Exhibit #4**).

8.     A scathing Performance Audit Report of Tennessee's CoreCivic facilities conducted by the Tennessee Comptroller of the Treasury in January 2020 determined—

among myriad additional deficiencies—that CoreCivic's management routinely failed to "implement or enforce established internal controls to ensure state and CoreCivic correctional facilities staff collected and accurately reported incident information" concerning "inmate deaths, inmate assaults, inmate violence, correction officers' use of force, and inmate accidents and injuries," and that CoreCivic had routinely destroyed records and evidence in contravention of state law. The findings in the Comptroller's Performance Audit Report—attached hereto as **Exhibit #5** (Tennessee Comptroller's Jan. 2020 Performance Audit Report, Tennessee Department of Correction)—are accurate and incorporated into this Complaint by reference.

9. A previous audit of CoreCivic's facilities had determined that Trousdale Turner Correctional Center, in particular, "operated with fewer than approved correctional staff, did not have all staffing rosters, did not follow staffing pattern guidelines, and left critical posts unstaffed"; that "CoreCivic staffing reports at Trousdale Turner Correctional Center contained numerous errors"; and that "Trousdale Turner Correctional Center management's noncompliance with contractual requirements and department policies relating to inmate services challenged the department's ability to effectively monitor the correctional facility."

10. In addition to unlawfully failing to collect—and in many instances destroying—records and evidence bearing upon its potential liability, CoreCivic has recently been caught _fabricating_ evidence in an effort to avoid liability for its recklessness concerning inmate health and safety. _See, e.g.,_ Brinley Hineman, _After Tennessee prison suicide, CoreCivic counselor fabricated health records of treatment: TDOC_, THE TENNESSEAN (Aug. 25, 2020), https://www.tennessean.com/story/news/crime/2020/08/26/after-tennessee-

-4-

prisoners-suicide-corecivic-worker-faked-health-records/3404186001/ (**Exhibit #6**).

11.     That CoreCivic routinely fails to comply with reporting obligations and conceals or destroys evidence that would expose its deliberate, profit-driven indifference to inmate health and safety are not new revelations.  Indeed, the State of Tennessee itself has all but stated directly that CoreCivic—and Trousdale Turner Correctional Center in particular—extensively engages in such behavior.  In the Comptroller's January 2020 Performance Audit Report, for example, the Comptroller specifically found that at Trousdale Turner Correctional Center, "health services staff had not entered any serious accidents or injuries on the Accidents screen in TOMIS during" _a one-and-a-half-year audit period_—something auditors found to be "questionable given the nature of the correctional environment" and specifically determined was "unlikely" to be accurate.  *See* **Exhibit #5**, p. 40.   Trousdale Turner Correctional Center officials ultimately acknowledged that their incident reporting was, in fact, inaccurate, claiming not to have been "aware" of applicable state reporting requirements.

12.     The data that ultimately was reported reflected that Trousdale Turner Correctional Center experienced the highest number of Class A incidents—defined as "life-threatening matters and breaches of security that are likely to cause serious operational problems," including "escapes and attempted escapes, deaths, assaults, hostage situations, total institutional lockdowns, rapes, certain uses of force, and various weapons"—of any facility audited in the entire State of Tennessee.  Remarkably, CoreCivic also managed to achieve this outcome despite the fact that "CoreCivic correctional facilities staff did not appropriately maintain original documentation of Class A incidents."  The following graph, appended to the Comptroller's report as Appendix-B-2, summarizes reported Class A incidents by each audited facility from October 1, 2017

through April 12, 2019:



**Appendix B-2**
**Summary of Class A Incidents (Those Involving Serious Risk to the Facility or Community) Reported by Location**
**October 1, 2017, Through April 12, 2019**

Source: Tennessee Offender Management Information System.

13.     Given this context, because the Plaintiff was housed at Trousdale Turner Correctional Center—one of CoreCivic's most dangerous, grossly understaffed, and under-resourced prison facilities—the Plaintiff never stood a chance.  Due to CoreCivic's calculated and profit-motivated recklessness to inmate health and safety, Mr. Carmen was the victim of a foreseeable and preventable assault enabled by CoreCivic's grossly inadequate safety measures.  Almost a full week after being viciously assaulted and left untreated, Mr. Carmen then received medical attention that was woefully inadequate to treat his injuries or prevent a dangerous infection from seeding and spreading throughout his body.  Ultimately, Mr. Carmen was carried out of his cell on a stretcher—near death— before finally being rushed to the hospital to undergo lifesaving treatment.

14.    After spending months recovering in and being discharged from the hospital, Mr. Carmen was transferred to Lois DeBerry Special Needs Facility to undergo nearly a year's worth of extensive—and expensive—follow up treatment and physical therapy to recover from his injuries. Lois DeBerry Special Needs Facility, of course, is a public, TDOC-operated prison. Accordingly, after CoreCivic—a private, for-profit prison corporation that is handsomely compensated by taxpayers—enabled and then dramatically exacerbated Mr. Carmen's injuries by providing him constitutionally inadequate medical care, the public also got to pay for Mr. Carmen's costly rehabilitation up until the moment it was complete. CoreCivic—which could not care less about Mr. Carmen's health or safety except to the extent it affects CoreCivic's profit margin—would never have it any other way.

## II.  PARTIES

15.    Plaintiff Robert Carmen is a citizen of Tennessee who at all times relevant to this Complaint resided within the Nashville Division of the Middle District of Tennessee. Mr. Carmen may be served through his counsel.

16.    Defendant CoreCivic of Tennessee, LLC, is a private prison corporation that cages human beings for profit, although it presently considers itself to be in the real estate business. CoreCivic owns and operates Trousdale Turner Correctional Center, the private prison that enabled and then exacerbated the Plaintiff's injuries. CoreCivic is a citizen of Tennessee with its principal place of business and corporate headquarters located in Brentwood, Tennessee. CoreCivic may be served through its registered agent at: CoreCivic of Tennessee, LLC, Registered Agent: C T CORPORATION SYSTEM, 300 MONTVUE RD, KNOXVILLE, TN 37919-5546.

17.    Defendant Emmanuel Akinyele is a contract nurse for CoreCivic who

-7-

provided constitutionally inadequate and grossly deficient medical treatment to the Plaintiff approximately a week after his injuries, allowing the Plaintiff's infection to spread, inadequately treated, throughout the Plaintiff's body. Defendant Akinyele can be served at 3001 Hamilton Church Rd., Unit 112, Antioch, TN 37013-1497, or wherever he may be found.

18. Defendant Lorrie Henson is a contract doctor for CoreCivic who oversaw the Plaintiff's constitutionally inadequate and grossly deficient medical treatment, allowing the Plaintiff's infection to spread, inadequately treated, throughout the Plaintiff's body. Defendant Henson can be served at 137 W. 2nd St., Cookeville, TN 38501, or wherever she may be found.

### III. JURISDICTION AND VENUE

19. This Court has jurisdiction over the Plaintiff's federal claims in this civil action pursuant to 28 U.S.C. § 1331.

20. This Court has supplemental jurisdiction to adjudicate the Plaintiff's state law claims related to the Plaintiff's federal claims in this action pursuant to 28 U.S.C. § 1367(a).

21. As the judicial district in which a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

22. As the judicial district in which all Defendants reside, and all Defendants being residents of the State of Tennessee, venue is independently proper in this Court pursuant to 28 U.S.C. § 1391(b)(1).

-8-

## IV.  FACTUAL ALLEGATIONS

23.     At approximately 2:00 a.m. on December 26, 2019, Plaintiff Robert Carmen was assaulted by three other inmates at Trousdale Turner Correctional Center, a private, for-profit prison operated by Defendant CoreCivic.

24.     All inmates at Trousdale Turner Correctional Center were supposed to be locked down at the time of Mr. Carmen's assault.   At Trousdale Turner Correctional Center, however, it is common for inmates to rig their cell doors in a manner than enables them to break out of their cells whenever they please—including during lockdowns.

25.     Defendant CoreCivic and the staff that CoreCivic employs at Trousdale Turner Correctional Center to maintain safety in the facility have actual knowledge that inmates at Trousdale Turner Correctional Center can—and often do—break out of their cells on a regular basis, including during lockdowns.

26.     Trousdale Turner Correctional Center is grossly understaffed, and the limited staff members employed at Trousdale Turner Correctional Center are unable to maintain a constitutionally adequate level of inmate safety in the facility.

27.     CoreCivic has actual knowledge that Trousdale Turner Correctional Center is understaffed.   Indeed, the facility is understaffed deliberately, because adequate staffing is expensive and understaffing is more profitable.

28.     CoreCivic has actual knowledge that the staff members employed at Trousdale Turner Correctional Center are unable to maintain a constitutionally adequate level of inmate safety in the facility.

29.     The guards employed at Trousdale Turner Correctional Center are underpaid.   Accordingly, guards at Trousdale Turner Correctional Center supplement their income by smuggling in drugs and needles to sell to inmates.   CoreCivic is actually

aware of this, too.

30. Generally speaking, the less money that CoreCivic spends on staff and inmate safety at Trousdale Turner Correctional Center, the higher CoreCivic's profit margin. In all instances, CoreCivic acts to maximize profit for the benefit of its shareholders.

31. On the night that Mr. Carmen was assaulted, there was not even an officer on duty in Mr. Carmen's pod, despite the fact that an officer is supposed to be on duty in each pod at all times.

32. Because no officer was on duty at the time of the Plaintiff's assault, the three inmates who assaulted Mr. Carmen were able to do so without difficulty and without encountering an officer in the Plaintiff's pod. Additionally, after the assault occurred, there was no officer available to help Mr. Carmen obtain badly needed medical attention.

33. The primary aggressor among the three inmates who assaulted Mr. Carmen hit Mr. Carmen in the lower jaw with a cafeteria tray.

34. Inmates are not supposed to be able to take cafeteria trays—which are neither small nor easy to hide—outside of the cafeteria. The inmate who assaulted Mr. Carmen was able to do so, however, because Trousdale Turner Correctional Center is grossly understaffed and it underinvests in inmate safety.

35. The inmates who assaulted Mr. Carmen broke Mr. Carmen's jaw in three places.

36. The inmate who hit Mr. Carmen with a cafeteria tray was from an entirely different pod than Mr. Carmen's. Accordingly, that inmate was not only able to escape his own prison cell; he was also able to move unmolested between the prison's _pods_—all while the entire compound was supposed to be locked down.

-10-

37.    A prison guard should have been on duty at the time of Mr. Carmen's assault.  Had a guard been on duty, the guard would have been available to prevent Mr. Carmen from being assaulted.  No such guard was present at the time of Mr. Carmen's assault.

38.    The front doors of Mr. Carmen's pod had been left ajar prior to Mr. Carmen's assault, giving the inmates who assaulted him freedom to roam the entire building.

39.    After the Plaintiff was assaulted, his jaw was shattered and broken so completely that when he moved his jaw, his teeth would visibly separate.

40.    The Plaintiff promptly reported his injury to CoreCivic employees.  In fact, he did so on several occasions.  For the first week after his injury, however, the Plaintiff was repeatedly denied medical attention.

41.    Although the Plaintiff promptly reported his injury, Defendant CoreCivic did not document either the injury or the Plaintiff's reports of it.

42.    The nurse to whom the Plaintiff first reported his injury told the Plaintiff that his injury "wasn't [the nurse's] problem."

43.    The Plaintiff made several more unsuccessful attempts to get medical attention for his visibly broken jaw over the ensuing days, documentation of which exclusively exists in Mr. Carmen's medical records due to CoreCivic's efforts to conceal it.

44.    For instance, when Mr. Carmen left the pod for "chow" the morning after his assault, he showed his visibly broken jaw to guards and begged for medical attention. Mr. Carmen was turned away and denied.

45.    Thereafter, Mr. Carmen attempted to report his injury and get medical attention again a day or two later.  He was denied again.  Further, CoreCivic punished the

Plaintiff for reporting his injury and attempting to seek medical attention by placing the Plaintiff "in the hole."

46.     Mr. Carmen was kept "in the hole" without medical attention until he was no longer strong enough to stand.  At that point, he just lay on the floor in his cell, begging for help.

47.     At some point, instead of sending Mr. Carmen to the emergency room, Trousdale Turner Correctional Facility staff made an appointment for him to be seen by a nurse several days later.

48.     The Plaintiff was kept in a cell with a visibly broken jaw that was broken in three places until January 2, 2020.  The Plaintiff did not receive medical attention during this time.

49.     Eventually—approximately a week after his jaw was broken in three places— the Plaintiff was brought out on a stretcher to see a nurse.

50.     During the time period between December 26, 2019 and January 2, 2020, the Plaintiff developed a serious infection that spread through his blood stream.

51.     The infection spread throughout the Plaintiff's body and joints.

52.     The Plaintiff became delirious from his infection to the point of hallucinating.  At one point, Mr. Carmen soiled himself because he was too weak and delirious to get out of bed and could not get medical attention from CoreCivic staff.

53.     The Plaintiff constantly screamed for help from CoreCivic employees during this time.  He was also constantly ignored and denied medical care.

54.     The Plaintiff's was finally evaluated by Defendant Akinyele, a nurse practitioner, on January 2, 2020.

55.     The Plaintiff's January 2nd treatment notes reflect that the Plaintiff had had

-12-

a "broken jaw" for "1 week."

56.     The Plaintiff's January 2nd treatment notes reflect that Mr. Carmen "reported incident occurred on Christmas."

57.     The Plaintiff's January 2nd treatment notes reflect that Mr. Carmen suffered from "right low jaw mandibular pain sustained during [unreadable] Dec. 26th, 2019," that he "appeared weak," that his right lower jaw showed visible "swelling and moving teeth," and that he had a "compound jaw FX [fracture]."

58.     The Plaintiff's January 2nd treatment notes reflect that Mr. Carmen had low blood pressure at the time he was evaluated.

59.     The Plaintiff's January 2nd treatment notes reflect that Mr. Carmen had a dangerously low, hypothermic-level body temperature at the time he was evaluated: just 95.4° F.

60.     Based on Mr. Carmen's known medical history and symptoms—and independent of his week-old, severely and repeatedly broken jaw—any minimally competent health care professional would have recognized that Mr. Carmen needed to be hospitalized immediately for infection, that he was or would become septic, and that he was at risk of fatal endocarditis.

61.     Instead of hospitalizing the Plaintiff, Defendant Akinyele prescribed him ibuprofen, gave him a small dose of antibiotic, and placed him on a "pureed diet" for the next 14 days.

62.     This treatment plan was woefully insufficient to address the dangerous and life-threatening infection spreading throughout Mr. Carmen's bloodstream and setting into his joints.  Thus, Mr. Carmen did not make it for an additional 14 days.  Indeed, Mr. Carmen would have died if this treatment plan had been maintained.

-13-

63.     An x-ray confirmed that Mr. Carmen had suffered a "bilateral mandibular fracture" on January 2, 2020 at 7:28 ET.

64.     According to Mr. Carmen's medical records, Defendant Lorrie Henson, an MD employed by CoreCivic, oversaw Mr. Carmen's treatment and noted Mr. Carmen's bilateral mandibular fracture on January 4, 2020 at 18:37.

65.     By this point, Mr. Carmen was likely septic, and a life-threatening infection had spread throughout his body.  He was eventually rushed to the hospital for emergency treatment days later.

66.     After being hospitalized due to infection, the Plaintiff had to undergo— among other excruciatingly painful treatment—all of the following lifesaving measures: two surgeries to his jaw; open heart surgery including a valve replacement; two surgeries on his left shoulder; one surgery on his right shoulder; lanced boils; insertion of metal plates in his jaw; removal of two of his teeth; insertion of a pacemaker; and several other procedures to treat both his shattered jaw and the infection that resulted from the Defendants' inadequate treatment and deliberate indifference to Mr. Carmen's visibly precarious medical condition.

67.     The Plaintiff remained hospitalized for months as a consequence of the near-fatal infection that the Defendants allowed to spread throughout the Plaintiff's body and inadequately treated after Defendant CoreCivic allowed the Plaintiff to be assaulted in the first place.

68.     After being released from the hospital, the Plaintiff was transferred to Lois DeBerry Special Needs Facility to begin his rehabilitation.  There, the Plaintiff was placed on an IV drip, received antibiotics, received wound care, and began extensive physical therapy for his injuries and the permanent partial disability that he had developed due to

-14-

infection. Taxpayers bore the initial expense of this treatment, even though CoreCivic was responsible for the injuries that gave rise to it.

69.     Mr. Carmen is not expected to regain full mobility in his left shoulder due to nerve damage caused by the infection that the Defendants enabled to spread—undiagnosed and inadequately treated—throughout Mr. Carmen's body after Defendant CoreCivic allowed him to be viciously assaulted in the first place.

70.     After Mr. Carmen completed his costly rehabilitation at Lois DeBerry Special Needs Facility, he was transferred back to another CoreCivic facility, where he resides now and lives in fear for his life.

71.     CoreCivic either strategically failed to document and/or maintain records regarding Mr. Carmen's assault, or else, it spoliated evidence of Mr. Carmen's assault and Mr. Carmen's reports of it after the assault took place.

72.     As of May 2020, there were no records of Mr. Carmen's assault—which had clearly occurred—other than references to it contained in Mr. Carmen's medical records.

73.     Strategically failing to document assaults, failing to maintain records, and destroying evidence bearing upon CoreCivic's recklessness and potential liability are part of a larger pattern and practice adopted by CoreCivic to evade liability, accountability, and the attention of regulators and others.

74.     At least one material component of the Plaintiff's medical records was falsified, whether intentionally or otherwise, after the Plaintiff was assaulted—inhibiting Mr. Carmen's counsel from obtaining access to it.

75.     Falsifying or inadequately documenting medical records is part of a larger pattern and practice adopted by CoreCivic to evade liability, accountability, and the attention of regulators and others.

76. CoreCivic failed to timely transfer Mr. Carmen's medical records to his future healthcare providers after enabling and exacerbating his injuries, affecting the Plaintiff's subsequent treatment.

77. After Mr. Carmen's jaw was shattered, CoreCivic caused Mr. Carmen to suffer pain needlessly when relief was readily available.

78. CoreCivic knew of and was independently placed on notice regarding the harm that it caused the Plaintiff through its reckless actions and omissions. Thereafter, CoreCivic declined to attempt to make amends by offering the Plaintiff a prompt and fair settlement for actual harm caused.

79. According to CoreCivic and TDOC policy, claims and grievances concerning monetary compensation and diagnoses by medical professionals are "inappropriate" for the administrative process and are not subject to exhaustion. *See* TDOC Administrative Policies and Procedures, Index #501.01 (May 2, 2018), https://www.tn.gov/content/dam/tn/correction/documents/501-01.pdf (**Exhibit #7**). Accordingly, litigation was the Plaintiff's only remedy for his claims. Improper actions of prison officials also rendered administrative remedies functionally unavailable to the Plaintiff. CoreCivic officials additionally failed to respond to the Plaintiff's timely and repeatedly reported grievances regardless.

## V. CAUSES OF ACTION

### CLAIM #1: 42 U.S.C. § 1983—DEFENDANT CORECIVIC'S FAILURE TO PROTECT THE PLAINTIFF FROM INMATE-ON-INMATE VIOLENCE

80. The Plaintiff incorporates and realleges the foregoing allegations as if fully set forth herein.

81. At all times relevant to this Complaint, CoreCivic had legal duties under the

-16-

Eighth Amendment to protect Mr. Carmen from violence at the hands of other prisoners and to ensure Mr. Carmen's reasonable safety at its facility.

82.     Core Civic has an unconstitutional policy or practice of maintaining staffing levels insufficient to ensure that inmates like the Plaintiff are protected from inmate-on-inmate violence.

83.     CoreCivic may be held liable for acting with deliberate indifference to Mr. Carmen's safety at Trousdale Turner Correctional Center.

84.     CoreCivic failed to protect Mr. Carmen from violence at the hands of other prisoners.

85.     CoreCivic failed to ensure Mr. Carmen's reasonable safety at Trousdale Turner Correctional Center.

86.     CoreCivic acted with deliberate indifference to Mr. Carmen's safety while he was an inmate at Trousdale Turner Correctional Center.

87.     CoreCivic knew that Mr. Carmen and other inmates faced a substantial risk of serious harm at Trousdale Turner Correctional Center.

88.     CoreCivic disregarded the risks to Mr. Carmen at Trousdale Turner Correctional Center by failing to take reasonable measures to abate them.

89.     CoreCivic was actually aware of the specific and particularized risks of serious harm posed to inmates like Mr. Carmen as a consequence of, *inter alia*, the deliberate understaffing of Trousdale Turner Correctional Center; Trousdale Turner Correctional Center's failure to adhere to safety protocols; and Trousdale Turner Correctional Center's reckless failure to secure prison cells, prison pods, and Trousdale Turner Correctional Center generally.

90.     At the time Mr. Carmen was assaulted, Trousdale Turner Correctional

Center was plagued by constant and pervasive risks of physical harm to inmates.

91.    At the time Mr. Carmen was assaulted, Trousdale Turner Correctional Center's pervasive risk of harm to inmates manifested in actual harm and constant inmate-on-inmate attacks, only a fraction of which are officially documented.

92.    At the time Mr. Carmen was assaulted, Trousdale Turner Correctional Center was plagued by longstanding, pervasive, well-known, or expressly noted inmate-on-inmate attacks that routinely went unreported to state regulators.

93.    At the time Mr. Carmen was assaulted, CoreCivic had been exposed to information concerning the risk of physical harm to inmates housed at Trousdale Turner Correctional Center and must have known about it.

94.    At the time Mr. Carmen was assaulted, CoreCivic had actual knowledge of the constant and pervasive risk of physical harm to inmates like Mr. Carmen at Trousdale Turner Correctional Center.

95.    CoreCivic is further aware of the specific and particularized risk of serious harm posed to inmates like Mr. Carmen as a consequence of the fact that—rather than maintaining inmate safety—its staff facilitates violence by smuggling in drugs and needles to enable drug use and the spread of contraband within Trousdale Turner Correctional Center.

96.    To the extent that CoreCivic attempts to segregate violent inmates from non-violent inmates at Trousdale Turner Correctional Center, such attempts are rendered ineffectual by the fact that inmates are not meaningfully secured in their cells and the fact that pods are frequently left unsecured, even during lockdowns.

97.    Despite CoreCivic's actual awareness of the severe risks to inmate safety within Trousdale Turner Correctional Center, it consciously and deliberately fails to

address those risks because CoreCivic's deliberate indifference to inmate safety is profitable.

CLAIM #2: 42 U.S.C. § 1983—DEFENDANT CORECIVIC'S DELIBERATE INDIFFERENCE TO THE PLAINTIFF'S MEDICAL NEEDS FROM DEC. 26, 2019 –JAN 1, 2020

98.     The Plaintiff incorporates and realleges the foregoing allegations as if fully set forth herein.

99.     Contracting out prison medical care does not relieve CoreCivic, while it is exercising a traditional state function, of its constitutional duty to provide adequate medical treatment to those in its custody.

100.    The Eighth Amendment imposes several minimal requirements on prison officials, including requiring them to: (i) provide humane conditions of confinement, (ii) ensure that inmates receive adequate medical care, and (iii) take reasonable measures to guarantee the safety of the inmates.

101.    Through its deliberate indifference to the Plaintiff's serious medical needs, CoreCivic failed to provide the Plaintiff with appropriate medical treatment in violation of the Eighth Amendment.

102.    The Plaintiff's visibly broken jaw was a medical condition that was "sufficiently serious" to warrant treatment.

103.    The Plaintiff's visibly broken jaw was a medical condition that was so obvious that even a lay person would easily recognize the need for a doctor's attention.

104.    By failing to provide the Plaintiff medical treatment between December 26, 2019 and January 1, 2020, CoreCivic acted with objective and subjective deliberate indifference to the Plaintiff's serious medical needs, causing the Plaintiff to experience wanton pain and allowing the Plaintiff's infection to spread throughout his body

thereafter.

105.     Because it performs a traditional state function while operating a state prison, CoreCivic acts under the color of state law.

106.     In contrast to the State of Tennessee, CoreCivic is not entitled to Eleventh Amendment immunity and may be held liable under § 1983 "if its official policies or customs resulted in injury to the plaintiff."[1]

107.     Core Civic has an unconstitutional policy or practice of maintaining staffing levels insufficient to ensure that inmates like the Plaintiff receive minimally adequate medical attention after suffering injuries attributable to inmate violence.

108.     In order to maximize profit, CoreCivic employs dangerously insufficient and unqualified medical staff to provide medical care to the inmates that CoreCivic houses.

109.     CoreCivic actively discourages injured inmates from reporting their injuries and/or punishes them for doing so in an effort to maximize profit and prevent the State of Tennessee from discovering the dangerous conditions within its facilities.

110.     Due in whole or in part to the above policies and CoreCivic's deliberate decision to prioritize profit over providing constitutionally adequate inmate health care, Mr. Carmen did not receive medical treatment for his shattered jaw for nearly a week after his assault, exposing him to needless and wanton pain and injury.

CLAIM #3: 42 U.S.C. § 1983—UNCONSTITUTIONAL RETALIATION BY DEFENDANT CORECIVIC

111.     The Plaintiff incorporates and realleges the foregoing allegations as if fully set forth herein.

---

[1] *O'Brien v. Mich. Dep't of Corr.*, 592 Fed. Appx. 338, 341 (6th Cir. 2014); *see also Mason v. Doe*, No. 3:12CV-P794-H, 2013 WL 4500107, at *1 (W.D. Ky. Aug. 21, 2013) (collecting cases) ("a private corporation may be liable under § 1983 when an official policy or custom of the corporation causes the alleged deprivation of a federal right").

112.    At all times relevant to this Complaint, the Plaintiff retained First Amendment rights that were not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system, and he had a right to seek medical care.

113.    Retaliation based upon a prisoner's exercise of his constitutional rights violates the Constitution.

114.    By reporting his injuries, asking for, and seeking medical attention, the Plaintiff engaged in activities protected by the Constitution and/or by statute.

115.    In retaliation for the Plaintiff reporting his injuries, asking for, and seeking medical attention, CoreCivic and its agents took an adverse action against the Plaintiff.

116.    The adverse action that CoreCivic took against the Plaintiff would deter a person of ordinary firmness from continuing to engage in constitutionally protected conduct and would likely have a strong deterrent effect on an inmate who believed that treatment was necessary to address a serious medical condition. *Cf. Wash v. Gilless*, 215 F.3d 1328 (6th Cir. 2000).

117.    CoreCivic's adverse action was taken at least in part because of the Plaintiff's exercise of protected conduct.

CLAIM #4: 42 U.S.C. § 1983—DEFENDANTS' DELIBERATELY INDIFFERENT
MEDICAL TREATMENT FROM JAN 2, 2020 UNTIL THE PLAINTIFF'S HOSPITALIZATION

118.    The Plaintiff incorporates and realleges the foregoing allegations as if fully set forth herein.

119.    Private medical providers providing medical care for a prison facility do not enjoy qualified immunity.[2]

---

[2] *See, e.g., Harrison v. Ash*, 539 F.3d 510, 524 (6th Cir. 2008).

120.    In the Sixth Circuit, an inmate's Eighth Amendment claim based upon deliberate indifference to medical needs is "akin to recklessness,"[3] and it carries both objective and subjective components.

121.    From January 2, 2020 until the Plaintiff's hospitalization, the Plaintiff had an objectively serious need for medical treatment that the Defendants failed to provide.

122.    At all times from January 2, 2020 until the Plaintiff's hospitalization, the Plaintiff had an objectively serious need to be hospitalized immediately.

123.    From January 2, 2020 until the Plaintiff's hospitalization, the Defendants subjectively perceived facts from which to infer a substantial risk to Mr. Carmen's health, they in fact drew the inference, and they disregarded the risk.

124.    From January 2, 2020 until the Plaintiff's hospitalization, the Defendants were actually aware of the Plaintiff's medical history, that the Plaintiff had suffered a mandibular bilateral fracture, that the Plaintiff had low blood pressure, and that the Plaintiff had a hypothermic-level temperature, all of which presented medical needs that were "sufficiently serious" to warrant significant intervention and medical treatment.

125.    At all times relevant to this Complaint, the Defendants were or should have been aware of Mr. Carmen's medical history and his unusually grave risk of infection.

126.    The risks of serious harm and infection that Mr. Carmen faced as a consequence of his medical history, his shattered jaw, his low blood pressure, and his hypothermic-level temperature were obvious from at least January 2, 2020 forward.

127.    At all times from January 2, 2020 until the Plaintiff's hospitalization, the Defendants consciously disregarded the Plaintiff's serious medical needs by failing to

---

[3] *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 447 (6th Cir. 2014).

refer him to the hospital.

128.    At all times from January 2, 2020 until the Plaintiff's hospitalization, the medical care that the Plaintiff received from the Defendants was so minimal as to amount to no meaningful treatment at all.

129.    At all times from January 2, 2020 until the Plaintiff's hospitalization, the Defendants were deliberately indifferent to the Plaintiff's serious medical needs and his risk of infection.

130.    The Defendants' deliberate indifference to the Plaintiff's medical needs exacerbated the Plaintiff's injuries; enabled the Plaintiff's infection to develop and then spread, nearly resulting in his death; resulted in the need for the Plaintiff to undergo approximately a dozen excruciating surgeries; and caused the Plaintiff to suffer serious injuries and a permanent partial disability.

CLAIM #5:  TENNESSEE HEALTH CARE LIABILITY ACT

**HEALTH CARE LIABILITY CLAIMS**

131.    The Plaintiff incorporates and realleges the foregoing allegations as if fully set forth herein.

132.    Defendant CoreCivic, and its facility, Trousdale Turner Correctional Center, may be, for purposes of this action, considered a "health care provider" as that term is defined by Tenn. Code Ann. § 29-26-101(2).  When treating the Plaintiff, CoreCivic had a provider-patient relationship with the Plaintiff.

133.    Defendant Akinyele is a "health care provider," as that term is defined by Tenn. Code Ann. § 29-26-101(2)(A), who had a provider-patient relationship with the Plaintiff.

134.    Defendant Henson is a "health care provider," as that term is defined by

-23-

Tenn. Code Ann. § 29-26-101(2)(A), who had a provider-patient relationship with the Plaintiff.

135.    At all times relevant to this action, Defendants Akinyele and Henson were employed by and acted as agents of Defendant CoreCivic.

136.    Whenever Defendants Akinyele and Henson provided care to the Plaintiff, they did so as agents of Defendant CoreCivic and on behalf of Defendant CoreCivic.

137.    The Plaintiff had no role in selecting Defendants Akinyele and Henson to provide medical care to him.

138.    The Defendants had a duty to provide the Plaintiff appropriate medical care and treatment.

139.    The Defendants failed to comply with the applicable recognized standard of acceptable professional care ("standard of care") when they provided care and treatment to the Plaintiff.

140.    The ways in which the Defendants failed to comply with the applicable standard of care include, but are not limited to, failing to treat Mr. Carmen for nearly a week following his injury; failing to prevent Mr. Carmen from developing an infection; failing to identify or meaningfully treat Mr. Carmen's infection after it developed; failing to prevent Mr. Carmen's infection from spreading throughout his body; failing to diagnose Mr. Carmen's endocarditis; and failing to refer Mr. Carmen to the hospital on each day from at least January 2, 2020 until his hospitalization.

141.    All of the above acts also constituted reckless conduct.

142.    As a direct and proximate result of the Defendants' actions, the Plaintiff suffered serious and preventable injuries and developed a permanent partial disability.

## COMPLIANCE WITH STATUTORY NOTICE AND GOOD FAITH REQUIREMENTS

143.    The Plaintiff, through counsel, complied with the provisions of Tenn. Code Ann. § 29-26-121 requiring individuals asserting a potential health care liability claim to give written notice of such potential claim to each health care provider that will be a named Defendant at least 60 days prior to filing a complaint ("Pre-Suit Notice" or "Notice").[4]

144.    More than 60 days prior to filing this Complaint, Notice was given to each Defendant in accordance with Tenn. Code Ann. § 29-26-121.

145.    Counsel's Affidavit and supporting documentation demonstrating Plaintiff's compliance with regard to Notice are appended to this Complaint as **Exhibit #8.**

146.    In an effort to circumvent receipt of Pre-Suit Notice, Defendants Akinyele and Henson have both furnished knowingly inadequate addresses to the Tennessee Department of Health, even though Pre-Suit Notice must be sent to those addresses.

147.    The Defendants had the opportunity to review the facts of this matter between the time of Plaintiff's provision of Pre-Suit Notice and the filing of this Complaint.

148.    Neither the Defendants, nor any agent acting on a Defendant's behalf, ever communicated to counsel for the Plaintiff any inability or problem with obtaining or reviewing the Plaintiff's pertinent medical records, to which counsel for the Plaintiff provided access via an appropriate, HIPAA-compliant release for each Defendant to use

---

[4] "[C]ourts in this district have held that the THCLA 'is wholly inapplicable' to Section 1983 claims for deliberate indifference to serious medical needs under the Eighth Amendment." *Whitworth v. CoreCivic*, Inc., No. 3:17-CV-01121, 2019 WL 1427934, at *8 (M.D. Tenn. Mar. 29, 2019) (quoting *Pruitt v. McConnell*, No. 3:13-01003, 2015 WL 632142, at *1 (M.D. Tenn. Feb. 13, 2015)).  Accordingly, this section concerns only the Plaintiff's state law THCLA claims.  The THCLA is otherwise inapplicable to this action.  *See id.*

to obtain records.

149.    No Defendant has attempted to make amends for the Plaintiff's injuries by offering a prompt and fair settlement for actual harm caused.

150.    In accordance with Tenn. Code Ann. § 29-26-122, the Plaintiff's counsel has consulted with one or more medical experts who provided a signed, written statement confirming that upon information and belief, they are competent under Tenn. Code Ann. § 29-26-115 to express opinions in this case, and they believe, based on the information available from medical records concerning the care and treatment of the Plaintiff, that there is a good faith basis to maintain this action consistent with the requirements of Tenn. Code Ann. § 29-26-115 ("good faith requirement").

151.    The Plaintiff's Certificate of Good Faith demonstrating compliance with the HCLA's good faith requirement is attached to this Complaint as **Exhibit #9.**

## CAUSATION AND DAMAGES

152.    As a direct and proximate result of the Defendants' breaches of the standard of care, the Plaintiff suffered serious injuries, extensive surgical interventions, excruciatingly painful medical treatment, long-term hospitalization and rehabilitation, and a permanent partial disability that he would not have otherwise sustained.

153.    This lawsuit seeks all compensatory damages available under Tennessee law, including economic damages and non-economic damages. These requested damages include, but are not limited to, physical pain and suffering, medical expenses, lost earnings, lost earning capacity, and emotional pain and suffering.

154.    This lawsuit additionally seeks punitive damages for the acts described herein involving a conscious disregard for the known risk of harm posed to the Plaintiff, which constitutes reckless conduct.

-26-

155.     No statutory cap on damages applies to this action due to the falsification and concealment of the Plaintiff's medical records.

CLAIM #6: TENN. CODE ANN. § 1-3-121

156.     The Plaintiff incorporates and realleges the foregoing allegations as if fully set forth herein.

157.     Defendant CoreCivic knowingly and deliberately fails to ensure a constitutionally adequate level of inmate safety at its Tennessee-based facilities.

158.     Defendant CoreCivic knowingly and deliberately fails to ensure a constitutionally adequate level of inmate safety at its Tennessee-based facilities because it is cheaper and more profitable not to do so.

159.     Defendant CoreCivic knowingly and deliberately fails to provide constitutionally adequate inmate healthcare at its Tennessee-based facilities.

160.     Defendant CoreCivic knowingly and deliberately fails to provide constitutionally adequate inmate healthcare at its Tennessee-based facilities because it is cheaper and more profitable not to do so.

161.     In an effort to prevent the fact of its chronic, profit-motivated deliberate indifference to inmate health and safety from reaching Tennessee regulators, legislators, and others, Defendant CoreCivic fails to document, disposes of, takes measures to conceal, and/or falsifies records and evidence of its deliberate indifference to inmate health and safety at its Tennessee-based facilities.

162.     Tenn. Code Ann. § 1-3-121—a recently enacted state law designed to enable plaintiffs to vindicate claims for declaratory and injunctive relief in cases involving illegal and unconstitutional government action—provides that: "Notwithstanding any law to the contrary, a cause of action shall exist under this chapter for any affected person who seeks

-27-

declaratory or injunctive relief in any action brought regarding the legality or constitutionality of a governmental action."

163.    Defendant CoreCivic's actions contravene the provisions of the Eighth Amendment to the United States Constitution.

164.    Defendant CoreCivic's actions additionally contravene the provisions of Tenn. Const. art. I, § 32 ("That the erection of safe prisons, the inspection of prisons, and the humane treatment of prisoners, shall be provided for.").

165.    Defendant CoreCivic's actions contravene Tennessee laws governing record maintenance and reporting at its Tennessee facilities.

166.    Absent regular independent monitoring and an injunction compelling Defendant CoreCivic to remedy its chronic and profit-motivated constitutional deficiencies and other unlawful conduct described above, Defendant CoreCivic will continue to fail to ensure a constitutionally adequate level of inmate safety and continue to fail to provide constitutionally adequate inmate healthcare at its Tennessee-based facilities.

167.    To remedy CoreCivic's illegal and unconstitutional actions, this Court should appoint an independent monitor to conduct regular inspections of CoreCivic's Tennessee-based facilities and issue a permanent injunction compelling Defendant CoreCivic to remedy its chronic and profit-motivated unlawful conduct with respect to inmate safety, inmate healthcare, and CoreCivic's maintenance of records regarding and reporting of the same.

168.    Alternatively, a permanent injunction should issue enjoining Defendant CoreCivic from continuing to operate any prison facility in the State of Tennessee.

# VI.  PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays for the following relief:

1.    That proper process issue and be served upon the Defendants, and that the Defendants be required to appear and answer this Complaint within the time required by law;

2.    That the Plaintiff be awarded all compensatory, consequential, and incidental damages and punitive damages to which Plaintiff is entitled in an amount not less than $2,000,000.00;

3.    That the Plaintiff be awarded all costs and discretionary costs of trying this action;

4.    That the Plaintiff be awarded his reasonable attorney's fees pursuant to 42 U.S.C. § 1988(b);

5.    That a jury of 12 be empaneled to try this cause;

6.    That pre-judgment and post-judgment interest be awarded to the Plaintiff;

7.    That permanent injunctive relief issue as described in this Complaint; and

8.    That the Plaintiff be awarded all further relief to which he is entitled.

Respectfully submitted,

/s/ Daniel A. Horwitz_____
Daniel A. Horwitz, BPR #032176
4016 Westlawn Dr.
Nashville, TN 37209
daniel.a.horwitz@gmail.com
(615) 739-2888

Afsoon Hagh, BPR#28393
47 Music Square West
Nashville, TN 37203
afsoon@haghlaw.com
(615) 266-3653

*Attorneys for Plaintiff*

-29-